**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

AARON LITTLE FRENCH,                    *

Plaintiff                               *

v                                       *         Civil Action No. CCB-15-3954

WARDEN FRANK BISHOP, *et al.*,          *

Defendants                              *
                                       ***

## MEMORANDUM

Pending is a motion to dismiss, or alternatively, for summary judgment filed by defendants Wexford Health Sources, Inc., ("Wexford"), William Beeman, R.N., Janette Clark, N.P., Ava Joubert-Curtis, M.D., and Mahboob Ashraf, M.D., ("Medical Defendants"). ECF No. 12 .[1] Also pending is a motion to dismiss, or alternatively for summary judgment filed by defendants Warden Frank Bishop, Chief of Security William Bohrer, Sgt. Gregory Forney, Officer Shawn Murray, Officer Dale Troutman, Officer Eric Gotjen, and Officer Zachary Gentzler ("Correctional Defendants").[2] ECF No. 20.[3] Plaintiff has filed an opposition response. ECF Nos. 32, 33 & 36.[4] Upon review of the pleadings filed, the court finds a hearing in this

---

[1]      Counsel has not accepted service on behalf of Officers Milo or Shreve.  Plaintiff's complaint against Milo and Shreve shall be dismissed without prejudice.  *Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008).

[2]      The Clerk shall amend the docket to reflect the correct names of all defendants.

[3]      Citations are to the court's electronic docket except as to ECF No. 12, Ex 1, which is filed separately in paper format.

[4]      The oppositions were docketed as "supplements to the complaint." Plaintiff's allegations, raised for the first time in his opposition responses, that he was improperly transferred to NBCI's administrative segregation on June 3, 2014, his crutches confiscated, and that he ultimately received an infraction for refusing housing, resulting in his being placed on disciplinary segregation,  where he was then harassed by staff, assigned a top bunk, dragged from his cell, placed in a strip cell for five days on staff alert, unable to file an ARP because he was without a pen, and unable to order commissary, are not properly before the court and will not be considered. ECF No. 32, pp. 3–5; ECF No. 33, pp. 2–5.  French may file a new complaint if he chooses to raise these claims. In light of the foregoing determination, defendants' motion to strike the response (ECF No. 35) shall be denied.

matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons stated below, defendants' dispositive motions will be GRANTED.

## I. Complaint Allegations

Plaintiff Aaron Little French, an inmate currently confined at North Branch Correctional Institution (NBCI) in Cumberland, Maryland, filed this complaint and alleged that defendants have been deliberately indifferent to his serious medical needs.  ECF No. 1.

Specifically, plaintiff states that defendants have colluded to force him to walk by taking his crutches and refusing to feed him in his cell.  ECF No. 1, p. 3.  He claims that on April 22, 2014, he twisted or rolled his right ankle while playing basketball. *Id*., p. 4.  Plaintiff was seen on April 25, 2014, by Dawn Hawk, R.N.  At that time, plaintiff states his foot was swollen to almost twice its normal size and he could not walk as he could not put on his shoe. *Id*. He states he was not provided treatment at that time but rather was referred to see a physician. *Id*., pp. 5–6.

On May 1, 2014, plaintiff was seen by Dr. Ava Joubert who ordered x-rays, directed plaintiff to use crutches, and provided plaintiff a splint for his foot. *Id*., p. 6.  Dr. Joubert did not provide plaintiff pain medication or ice to reduce the swelling. *Id*.  Dr. Joubert also referred plaintiff to see a "foot specialist." *Id*.

The following day, Officers Troutman and Milo came to plaintiff's cell door to escort him to the neighboring prison to be seen by the specialist. *Id*.  Plaintiff instructed his cellmate to advise the officers that he needed five minutes to get ready as he did not know he was going to be taken to Western Correctional Institution (WCI).  Plaintiff states that officers attempted to pressure him to drop everything and go "as is."  Milo asked plaintiff if he was going to go to WCI because Milo did not care if plaintiff went or not. *Id*.   Plaintiff insisted on finishing

brushing his teeth and taking care of other hygiene matters. The officers did not wait for him, nor did they return to take him to his appointment. *Id.*, p. 8. Plaintiff claims that Milo or Troutman then "lied" to medical staff advising them that plaintiff refused to go to his appointment. *Id*. He indicates that this resulted in medical personnel considering plaintiff's medical treatment "completed" since it was reported that he refused medical care. *Id*.

Plaintiff indicates that he filed prison administrative complaints against Milo and Troutman regarding this incident, which were dismissed. *Id.*, p. 9.

Medical staff insisted that plaintiff be rescreened and wait to be rescheduled to see the specialist. *Id*. Plaintiff states that it took from May 2, 2014, until June 6, 2014, to see the foot specialist, Dr. Carl. *Id*. An MRI was ordered so that the specialist could diagnose plaintiff's injury. *Id*.

Plaintiff states that on an unspecified date in June of 2014, he was seen by another medical provider. At that time he received pain medication. *Id*.

Plaintiff did not undergo the MRI until August 1, 2014. *Id.*, p. 10. He did not return for follow-up with the specialist until October 3, 2014. *Id*. The MRI revealed that plaintiff suffered a tear to his anterior talofibular ligament. *Id*. Dr. Carl referred plaintiff to physical therapy to see if the tear would heal on its own and indicated plaintiff should return in November for follow up. *Id.*, pp. 10–11. Plaintiff states that he began physical therapy on an unspecified date that November. *Id.*, p. 11.

Plaintiff states that NBCI has policies and procedures that it uses to ensure uniformity and promote safety and security. *Id.*, p. 12. An exemption to a security protocol may be made due to an order from a medical provider. *Id*. Plaintiff states that in December 2013, he had such a

medical order which stated that he was to be non-weight bearing on his right foot. He was incapable of walking and therefore he was to be provided a wheelchair or crutches. *Id*., p. 13. Officer Gotjen refused to provide plaintiff with a wheelchair or crutches despite the medical order having been posted on plaintiff's cell door. *Id*. Gotjen refused to escort plaintiff to his physical therapy appointments throughout December of 2014 unless plaintiff consented to use a medical walker and be handcuffed to the walker for his escorts. *Id*., p. 13. Plaintiff refused and did not attend physical therapy in December of 2014. *Id*., p. 14.

Plaintiff states that when he was released from administrative segregation on December 30, 2014, he was then able to attend physical therapy as he no longer required an escort. He attended physical therapy throughout January 2015. The therapy was terminated at the end of January 2015, after it was determined to be unsuccessful. *Id*.

On February 6, 2015, plaintiff was seen for follow up with Dr. Carl who ordered plaintiff undergo surgery to repair the torn ligament. *Id*., p. 16.

In March 2015, plaintiff slipped in the shower, aggravating his existing injury. *Id*. Plaintiff states that despite the exacerbation of his injury he did not receive any "commensurate medical treatment," was not provided an increase in pain medication, nor was he provided ice to use to reduce the swelling. *Id*.

Surgery to repair the ligament tear was performed on April 8, 2015. *Id*. The surgery "appeared successful" and plaintiff was released from the hospital that day. *Id*., p. 17. Plaintiff indicates that he only had minor inconveniences until May 24, 2015, when his 90 day "feed-in" order expired. *Id*. Plaintiff indicates that during that time he received all meals in his cell due to

4

his being unable to walk without the use of crutches and being otherwise too injured to walk the nearly half mile by crutches to the prison's kitchen to get his meals. *Id.*

Plaintiff indicates that in February 2015, he filed a grievance regarding the distance to the prison's kitchen being too far for him to navigate on crutches. *Id.*, p. 17–18. He also advised the medical department that the crutches were bruising and cutting the skin under his arms when he traveled such a distance for his meals. *Id.*, p. 18.

Plaintiff states that he submitted sick call slips to have his medical feed-in order renewed but did not get placed on the call-out until May 29, 2015. *Id.* Plaintiff states that he did not know he had an 8:00 a.m. call out because he usually did not come out of his cell before that time. When he was notified of his call out, his cell door was opened. Since he was unaware of the scheduled call-out it took him 6-7 minutes to dress and prepare but after about 3 minutes his cell door closed. *Id.*, pp. 18-19. Plaintiff called to the tier officer, Officer Gentzler, and asked that his cell door be opened so he could go to sick call. *Id.*, p. 19. Gentzler asked if plaintiff's name was on the call out and at what time. *Id.* He also asked if plaintiff's door had been opened earlier and why plaintiff had not made it out of his cell. *Id.* Plaintiff explained that he was temporarily handicapped and that he normally slept late due to his being injured and on no work or outside recreation status. *Id.*, p. 20. Gentzler advised plaintiff that his answer was not satisfactory and that he was not going to let plaintiff go to his sick call; that next time plaintiff should be ready. *Id.*

Plaintiff filed an administrative remedy complaint (ARP) on June 1, 2015. *Id.* On June 9, 2015, the Warden denied the ARP indicating it was plaintiff's fault that he missed sick call and that the Nurse Manager was consulted regarding plaintiff's feed-in status and he indicated that

the medical department was not going to renew plaintiff's feed-in order; he should walk to chow

if he wanted to eat. *Id.*, pp. 20–21.  Plaintiff states that his ARP was dismissed as being without

merit and "no higher appeal level ever responded to appeal submissions made by [him] on this

issue." *Id.*, p. 21.

While plaintiff waited to be seen again in sick call, he missed 79 meals between May 27,

2015, and July 9, 2015. *Id.*  Plaintiff states that he received his dinner meal each day during that

time, as the evening sergeants did not want plaintiff's crutches in the dinner time chow hall. *Id.*

It was at this time that plaintiff indicates he began to suspect collusion between the

medical department and NBCI administration because he was not seen by a provider after he was

twice referred by a mid-level provider.  *Id.*, p. 22.  Plaintiff indicates that on July 8, 2015, he was

finally able to see Nurse Practitioner Krista Swan during sick call.   Plaintiff opines that the

"medical issue was pushed aside in accord with the Warden's response to the ARP that stated per

Nurse Manger, the Medical Dept. had no intention to renew [his] medical feed-in order.  If [he]

was seen, the Medical Dept. would have to renew the order." *Id.*

Plaintiff indicates that his feed-in order was renewed but he had to go through "a bunch

of red-tape" including that the feed-in order had to be re-evaluated by the head provider, Dr.

Colin Ottey. *Id.*, p. 23.

During the time plaintiff was without a feed-in order he was assigned to physical therapy.

Plaintiff states that because he was missing meals each day, he slept in an effort to get to the next

day where a solution to the missed meals might be resolved. *Id.*, pp, 23–24.  Accordingly, he

"missed physical therapy and was dropped, unsuccessfully." *Id.*, p. 24.

In August 2015, plaintiff filed another ARP regarding missing feed-in meals.  Plaintiff indicates that he missed nine lunches on consecutive days when Officers Shreve and Murray ignored his request to get his missed meals. *Id.*  The ARP was dismissed on August 20, 2015, by the Warden, on the basis that plaintiff had not been ordered feed-in status. *Id.*  Plaintiff stated that he was in fact ordered feed-in status at that time as well as continuation of the order to use crutches. *Id.*, pp. 24–25. Plaintiff was scheduled for an ARP interview with Sgt. Forney on August 25, 2015.  Plaintiff indicates that he "felt challenged by the threatening demeanor of the Sargeant [sic] trying to pressure [him] to sign off and take back his complaint." *Id.*, p. 25. Plaintiff states that he was informed that correctional and medical staff were to meet to resolve his situation. *Id.*  After the care conference held on August 27, 2015, plaintiff states he became "sure of the collusion" between defendants. *Id.*

Plaintiff also claims that on November 22, 2015, he was notified by Officer Murray that he had a sick call callout that morning and was to get ready. *Id.*, p. 15. Plaintiff states he waited for staff all day but no one ever came to get him to go to sick call. *Id.* Officer Murray was in charge of his housing tier and was therefore responsible for denying him access to his sick call visit.  Plaintiff states that he was to have his pain medication extended on that date, but as a result of missing sick call, his pain medication was not renewed and he went without pain medication for nearly a month. *Id.*

## II. Defendants' Response

Medical defendants indicate that plaintiff has a medical history of obesity, hypertension and an ankle injury resulting in a talofibular ligament tear.  ECF No. 12, Ex. 1.  They indicate through affidavit and medical records that plaintiff has received constitutionally adequate

medical care, despite his frequent noncompliance with medical directives, which has resulted in further injury to his ankle. They further offer that plaintiff is routinely hostile to and argumentative with his medical providers. *Id*.

Correctional defendants indicate, through declarations and documentary evidence, that many of plaintiff's claims are unexhausted, none of the correctional staff were deliberately indifferent to his serious medical needs, and his conditions of confinement were constitutionally adequate. ECF No. 20.

On April 22 and 23, 2014, plaintiff submitted sick calls slips complaining of injury to his ankle, including swelling and pain, and also complaining of dandruff and snoring and seeking to have his migraine medicine renewed. ECF No. 12, Ex. 1, pp. 285–86. He was seen by Dawn Hawk, R.N., on April 25, 2014. *Id.*, pp. 1–2. He reported injuring his ankle during a basketball game. Examination revealed no bruising or malformation, but swelling was observed. *Id*. The nurse contacted a physician who directed plaintiff be provided Ibuprofen twice daily for two weeks and provided an ankle wrap. *Id*. Plaintiff was directed to file a sick call slip if his symptoms did not improve. *Id*.

Plaintiff was evaluated by Kristi Cortez, R.N., on April 30, 2014, due to continued complaints of ankle pain and swelling. *Id.*, pp. 3–5. Plaintiff reported pain at a 9 out of 10 on a 10 point scale. He reported taking the Ibuprofen and using the ankle wrap. He was observed walking with the use of a plastic chair. His right ankle showed significant swelling and while he was able to wiggle his toes, he could not flex or extend his ankle. Cortez contacted the physician who ordered x-rays of plaintiff's ankle. *Id.*, p. 394. Additionally, he was provided a cold compress and his ankle was immobilized with a splint. *Id.*, p. 5.

Later that day, plaintiff was seen by Ava Joubert, M.D. *Id*., p. 6.   He reported that he was unable to bear weight on his ankle since the injury. An assignment for crutches was placed for plaintiff.  He was advised to rest, apply ice, use compression, and elevate the ankle.  He was also provided a posterior ankle splint to use for one month. *Id*.

Plaintiff was seen again by Dr. Joubert on May 1, 2014.  *Id*., pp. 8–9.  The results of his x-rays were reviewed which showed no abnormality other than a one centimeter needle-like foreign body, which plaintiff later stated was a needle that he "lost" when he was 12. *Id*., p. 44. Plaintiff was diagnosed with a sprain/strain of the right ankle, provided a right short leg splint with plaster, and referred for an orthopedic surgeon consult. *Id*. Plaintiff was provided crutches that day. *Id*., p. 10.

On May 2, 2014, plaintiff refused to be seen by the orthopedist, Roy Carls, M.D. (*id*, p. 11), and a release of responsibility form was completed, which plaintiff refused to sign. *Id*., p. 428. Officers Mallow and Troutman arrived at plaintiff's housing unit to escort him and other inmates to their appointments at approximately 9:10 a.m. ECF No. 20, Ex. 2 (Durst Decl., p. 5). Inmates who had medical appointments at WCI were advised to get ready.  Mallow went to plaintiff's cell and plaintiff stated he was "still getting ready."   Mallow advised plaintiff he would give him five more minutes. *Id*.  Five minutes later, Troutman went to plaintiff's cell but plaintiff indicated he still was not ready and Troutman instructed him to hurry up. *Id*., Ex. 3 (Troutman Decl.).  Mallow returned to the cell and informed plaintiff that they would leave if he was not ready. *Id*., Ex. 2, p. 5.  French replied, "Man y'all [expletive] rushin me[.] I don't even care about the pass[.] I refuse." *Id*. Mallow informed the Officer in Charge of plaintiff's refusal and he and Troutman escorted the other inmates to WCI without incident. *Id*., Ex. 3.  Defendants

indicate that all told, plaintiff was given thirty minutes to get ready for the medical appointment but refused to do so. *Id.*, at ¶ 4.

On May 5, 2015, plaintiff submitted ARP-NBCI-1316-14 complaining that correctional officers refused to take him to his doctor's appointment at WCI. *Id.*, Ex. 2, p. 2.   After investigation, the ARP was dismissed as without merit. *Id.*, pp. 2–6. Plaintiff's appeal to the Commissioner of Corrections, dated August 11, 2014, was dismissed as untimely. *Id.,* p. 7.

Plaintiff was next seen for complaints of ankle pain and swelling on May 19, 2014. ECF No. 12, Ex. 1, pp. 12–14.  He denied refusing to attend the prior visit and indicated he wanted to be seen by an orthopedic surgeon. *Id.*, p. 12.   It was noted that plaintiff walked to the examination room on crutches and his right ankle had moderate swelling. A consultation request was again placed for plaintiff to be seen by Dr. Carls.  *Id.*, p. 14.   Dr. Joubert declined custody staff's request that plaintiff receive an order for a medical shower due to the length of time it took him to walk with crutches. *Id.*

Plaintiff was examined by Dr. Carls on June 6, 2014. *Id.*, p. 355.  Dr. Carls recommended plaintiff continue to not bear weight on the ankle and use the splint.[5] He also requested an MRI after which plaintiff was to return for follow-up. *Id.*

On June 12, 2014, plaintiff was seen by Dr. Joubert due to continued complaints of ankle pain and other unrelated complaints. *Id.*, p. 17.   Plaintiff's ankle remained swollen with limited range of motion. *Id.*, p. 18. Pursuant to Dr. Carls' recommendation, an MRI was ordered. Orders were also placed for plaintiff to be provided bottom bunk status, medical showers, and remain

---

[5]      Dr. Carls' notes indicate that plaintiff should have his splint on "whenever he is transferring or in a wheelchair." *Id.*, p. 355.  Subsequent medical notes, summarizing Dr. Carls' notes, apparently interpreted this to mean that Dr. Carls recommended plaintiff use a wheel chair when out of his cell (*id.*, p. 16–17), although it does not appear that any such order was ever entered by Dr. Carls.  On June 12, 2014, Dr. Joubert entered an order that plaintiff be permitted to use crutches or a wheelchair for 90 days. *Id.*, p. 18.

non-weight bearing for 90 days.[6] It was also ordered that he receive ice packs twice daily. *Id*. Dr. Joubert also submitted a non-formulary drug request for a 60 day prescription of Ultram (a narcotic like pain reliever) which was approved on June 13, 2014. *Id*., pp. 19–22.

During his examination by Dr. Joubert on July 10, 2014, Jones did not offer any complaints regarding his ankle, and reported removing his posterior ankle splint. *Id*., p. 32. Plaintiff was transported to his appointment in a wheelchair. *Id*. Crutches to assist plaintiff with walking were ordered through September 12, 2014. *Id*., pp, 32, 34.

An MRI was conducted on August 1, 2014, which revealed a right ankle anterior talofibular ligament tear with small joint effusion and a possible foreign body. *Id*., p. 396. Plaintiff consulted on August 7, 2014, with Dr. Joubert to discuss the results of the MRI. *Id*., pp. 44–45.  Plaintiff, when asked about the foreign body, indicated that he recalled that when he was 12 years old he lost a needle and surmised that the foreign body seen on the MRI was the lost needle.  Joubert placed an order for plaintiff to be seen by Dr. Carls. *Id*.

On September 19, 2014, plaintiff's medical assignments were renewed for six months. *Id.,* pp. 52–53.

Plaintiff returned to Dr. Carls on October 3, 2014. *Id.*, p. 356.  Plaintiff's ankle had mild swelling and good range of motion. Dr. Carls noted the MRI results showing a ligament tear.  He recommended physical therapy for one month, an ankle brace, and directed plaintiff to slowly begin to bear weight on the right foot as tolerated. *Id*. Plaintiff was advised to return after physical therapy was completed. *Id*.

---

[6]     On June 20, 2014, while housed on segregation, plaintiff asked a nurse during rounds if his medical paperwork for shower, bottom bunk, and ice had been completed.  The nurse indicated she would check on the status of the paperwork. *Id*., p. 23.That same day a chart update was entered indicating the medical orders for bottom bunk, medical shower, no weight bearing, and ice packs were entered and in effect for 90 days. *Id*., p. 24.

Plaintiff refused, on October 8, 2014, to be seen for a provider visit to discuss his visit with the orthopedist. A Release of Responsibility was completed, which plaintiff refused to sign. *Id.*, p. 432. Plaintiff refused to be seen for his medical visit on October 27, 2014.  In signing the Release of Responsibility he indicated that he required crutches or a wheelchair to go to the medical room. *Id.*, p. 434.

On November 12, 2014, plaintiff was seen by Colin Ottey, M.D., the Regional Medical Director. *Id.*, pp. 61–62.  Plaintiff reported pain with range of motion and ambulation as well as difficulty bearing weight. Dr. Ottey approved plaintiff for physical therapy evaluation and treatment and prescribed Elavil through January 13, 2015, (an antidepressant also used to treat neuropathic pain) for additional pain management. *Id.*

Plaintiff declined to be seen in the chronic care clinic on November 22, 2014. *Id.*, p. 436. A release of responsibility was completed, which plaintiff again refused to sign. *Id.* On that day, Officer Murray advised plaintiff he had a sick call scheduled and to get ready to attend. ECF No. 20, Ex. 4, p. 2 (Murray Decl.).  Given the number of inmates scheduled for sick call that day, Murray did not return to plaintiff's cell until two hours later.  Plaintiff shouted expletives at Murray and indicated that he would not attend the sick call. *Id.* Murray advised the medical department that plaintiff refused the appointment. *Id.*

Plaintiff was evaluated by the physical therapist on November 26, 2014. ECF No. 12, Ex. 1, p. 367. The goals set by the physical therapist were for plaintiff to ambulate independently and restore functional range of motion and strength to plaintiff's ankle. *Id.*  On December 4 and 9, 2014, plaintiff refused to attend his scheduled physical therapy appointment. *Id.*, pp. 368–69.  It

was noted that plaintiff refused to use a walker, insisting instead on crutches. *Id*. A release of responsibility was completed on each occasion, which plaintiff declined to sign. *Id*., pp. 441–42.

Correctional defendants indicate that plaintiff was housed in disciplinary segregation throughout most of December 2014, including between December 2 and December 24. ECF No. 20, Ex. 5, ¶ 4. (Declaration of Gotjen).  Inmates housed on disciplinary segregation are not allowed to keep ambulatory aids in their cell. *Id*. ¶ 5. Gotjen avers that when he is assigned to escort segregation inmates who are mobility impaired to medical appointments, he provides them with the ambulatory aid that the medical department provides. *Id*.  Gotjen further avers that multiple segregation inmates are typically escorted to the medical department at the same time. *Id*., ¶ 6. The inmates are shackled while escorted and are thus vulnerable to attack. *Id*.  Gotjen asked Bill Beeman, Assistant Director of Nursing, if plaintiff could be provided with a walker rather than crutches as crutches could more easily be used as a weapon against other inmates under escort as well as against correctional staff. *Id*.  Gotjen avers that this arrangement had been made for other mobility impaired segregation inmates in the past. *Id*. Beeman agreed that plaintiff could use a walker rather than crutches while walking to the medical department. *Id*.

Plaintiff was seen by Krista Swan, R.N.P., on December 13, 2014, for a provider chronic care visit for his hypertension and ankle pain. ECF No. 12, Ex. 1, pp. 66-68.  Plaintiff reported an increase in pain with range of motion, ambulation and weight bearing. *Id*. Swan placed a request for additional physical therapy and renewed plaintiff's prescription for Ultram. *Id*., pp. 69–72.

Officer Gotjen offered plaintiff the use of a walker each time he was assigned to escort plaintiff to physical therapy in December 2014. ECF No. 20, Ex. 5, ¶ 7.  On December 16, 18,

and 24, 2014, plaintiff refused to use the walker and to attend his scheduled physical therapy appointment. *Id.*; see also ECF No. 12, Ex. 1, pp. 370–72.   A release of responsibility was completed on each occasion, which plaintiff refused to sign. ECF No. 12, Ex. 1, pp. 443–45.

Plaintiff attended physical therapy on January 1, 3, 8, and 13, 2015. *Id.*, p. 373–77. On January 14, 2015, he was seen by Janette Clark, N.P., to review his need for additional physical therapy *Id.*, pp. 74–75. Additional physical therapy was not recommended. It was noted that plaintiff could continue exercises in his cell.  He reported that his prescription for Ultram was ineffective. His prescription for Elavil was reordered. His feed-in medical assignment was continued for 45 days due to his use of crutches in poor weather conditions and until he could be seen by the orthopedist. *Id.*

On January 22, 2015, it was noted that plaintiff was not taking his prescribed Elavil (Amitriptyline) and it was discontinued. *Id.*, p. 76.  That same day, as well as on January 29, 2015, plaintiff refused to attend scheduled physical therapy. *Id.*, pp. 378–79, 446. Plaintiff did attend physical therapy on February 1, 2015. *Id.*, p. 380.

On February 6, 2015, plaintiff was seen by Dr. Carls. *Id.*, p. 357.   Plaintiff reported severe pain in his ankle and reported that physical therapy exacerbated the pain. *Id.* Dr. Carls noted that the conservative treatment had been ineffective and recommended arthroscopic surgery. *Id.*  Dr. Carls discussed the risks and benefits of surgery with plaintiff. *Id.* Plaintiff was seen by Mahboob Ashraf, M.D., on February 12, 2015. *Id.*, p. 81.  Dr. Ashraf reviewed Dr. Carls' recommendation for arthroscopic surgery, including that its risks and benefits had been explained to plaintiff who indicated his understanding and acceptance.  *Id.* Dr. Ashraf placed a consultation request for plaintiff to receive the surgery. *Id.*, pp. 82–83.

Plaintiff was seen by Dr. Ottey on February 21, 2015. *Id.*, pp. 88–91. Plaintiff continued to report pain and an inability to bear weight on his right ankle.  Plaintiff's Ultram was renewed and Dr. Ottey advised plaintiff that he would discuss the treatment plan with Dr. Carls. *Id.* Additionally, Dr. Ottey renewed plaintiff's crutches for six months and his feed-in status for three months. *Id.*  Later that same day or the next day, plaintiff refused to attend a medical visit where he was to sign for his medical assignments. *Id.*, p. 92. A release of responsibility form was completed. *Id.*, p. 447.   On February 23, 2015, plaintiff was seen in medical to sign the paperwork for his medical assignments. *Id.*, pp. 93–94.  It was noted that he refused to sign off on his assignments the day before and was advised to attend all medical visits. *Id.* Plaintiff's medical assignments were updated on February 24, 2015. *Id.*, p. 97. He was seen by R.N.P. Swan later that day who noted that plaintiff was walking with crutches and his bottom bunk and medical shower assignments were extended for one year. *Id.*, pp. 98–100.

Plaintiff filed a sick call slip on March 11, 2015, indicating he slipped and fell in the shower further injuring his ankle. *Id.*, p. 306.  He was seen by Paula Conners, R.N. on March 14, 2015. *Id.*, pp. 104–06.  Plaintiff indicated that he twisted his ankle in the shower and that he was awaiting surgery on his ankle. His right ankle was swollen. He was advised to elevate his right foot and apply ice.  He was also advised to perform mild range of motion stretching exercises and referred to a provider for further evaluation and treatment. *Id.*

Plaintiff was seen by R.N.P. Swan on March 19, 2015. *Id.*, pp. 109–11.  His ankle was swollen and painful. Custody was advised that plaintiff was to be provided ice during the next three shifts. *Id.* His Ultram (Tramadol) dosage was increased (*id.*) and x-rays of his ankle taken

which showed no acute fracture, dislocation or subluxation. *Id.*, p. 398. Plaintiff was advised of the results of the x-ray on April 1, 2015. *Id.*, p. 118.

On March 19, 2015, plaintiff's crutch broke. *Id.*, pp. 112–13. Custody was alerted to allow plaintiff to use a wheelchair until new crutches could be provided. *Id.*

Plaintiff underwent a pre-operative health screening on March 25, 2015, which revealed no contraindications for surgery. *Id.*, pp. 114–16. On April 8, 2015, Dr. Carls performed a right ankle arthroscopy, partial synovectomy and debridement and a modified Brostrom reconstruction. *Id.*, pp. 358–64. Plaintiff tolerated the surgery well and was advised that he would require post-surgery physical therapy. *Id.* He returned to the prison infirmary later that day. *Id.*, pp. 123–24. He reported that he was tired but offered no other medical concerns at that time. It was noted that he was performing activities of daily living independently. *Id.*

While housed in the infirmary plaintiff ate his meals and offered no medical complaints. *Id.*, pp. 123–31. It was reported, however, that he demanded to leave several times and was advised that the infirmary physician had to discharge him. Additionally he refused several ice packs and was argumentative with infirmary staff, stating he did not want to speak to anyone. *Id.* He was discharged from the infirmary on April 9, 2015, and his feed-in status was ordered for two weeks. *Id.*, p. 130

Plaintiff was seen by a R.N.P. for a post-surgical follow-up visit. *Id.*, pp. 132–33. Dr. Carls was contacted and advised that plaintiff's dressing should not be changed until he returned for his follow up visit with Dr. Carls. *Id.* Plaintiff was seen by Dr. Carls on April 21, 2015. *Id.*, p. 365. Dr. Carls recommended daily dressing changes and ordered plaintiff begin physical therapy. *Id.* Plaintiff denied ankle pain at that time. *Id.*, p. 134.

The following day, April 22, 2015, plaintiff was seen by Leslie Paugh, L.P.N., for a dressing change. Plaintiff became "irate and argumentative" during the dressing change and refused to let Paugh complete the dressing change.  He continued to be argumentative with Paugh and custody staff. *Id*. A release of responsibility form was completed, which plaintiff signed. *Id*., p. 449. Plaintiff received daily dressing changes through April 28, 2015**.** *Id*., pp. 138–49.

On April 28, 2015, in addition to changing plaintiff's dressing, R.N.P. Clark increased plaintiff's bedtime Ultram dosage and added Baclofen (a muscle relaxer frequently used for pain management) to his medication regimen. *Id*., pp. 144–45.

Plaintiff was seen on May 14, 2015, for a physical therapy evaluation. *Id*., p. 381.  It was noted that plaintiff had received surgery five weeks earlier and was still not weight bearing. The goals for physical therapy were to have plaintiff ambulate without assistance, restore functional range of motion, and establish a self-management program. *Id*.

On May 15, 2015, plaintiff's assignments for bottom bunk and bottom tier were continued for one year. *Id*., 150–154.  His assignment to a medical cell was continued for six months. *Id*.  His feed-in status was discussed; however, medical records do not reflect that a separate order for feed-in status was entered. *Id*.  R.N.P. Swan noted that plaintiff reported pain with movement and that he was non-weight bearing. *Id*., pp. 152–54. Swan noted that she would increase plaintiff's pain medication while he was undergoing physical therapy. *Id*.

Plaintiff began physical therapy on May 22, 2015. ECF No. 12, Ex, 1, p. 382. He indicated that he had no complaints of pain and that he was "well medicated."  *Id*. He attempted range of motion exercises but stated he was not ready. *Id*.  He returned for physical therapy on

May 25, 2015, indicating he was "ready to work" but was reluctant to try any exercises and recanted his readiness to work. *Id.*, p. 383

Plaintiff was scheduled to be seen by N.P. Clark on May 29, 2015, to complete the paperwork for plaintiff's medical assignments, including his feed-in status.  *Id.*, p. 159. According to custody plaintiff refused to leave his cell.  A release of responsibility form was completed. *Id.*, p. 452.

Correctional defendants indicate that general population inmates at NBCI are required to eat meals in the NBCI chow hall unless they have a medical order to be fed in their cell. ECF No. 20, Ex. 6, ¶ 3 (Kammauf Decl.).  The feed-in orders are provided to NBCI's Food Service Department by the medical personnel and may not be revoked by a DPSCS employee. *Id.*, ¶¶ 3–4.  When an inmate has a medical order to be fed in his cell his meal is prepared at NBCI's kitchen and then sent to the inmate's housing unit where it is delivered to his cell by an inmate assigned to a dietary job. *Id.*, ¶ 5. Although plaintiff's medical records indicate his feed-in status was discussed and was to be renewed on May 15, 2015, NBCI's Food Service Department did not receive an order from medical for him to be fed in his cell between the dates of May 24, 2015 and July 8, 2015. *Id.*, ¶¶ 6 & 7.

Plaintiff filed ARP-NBCI-1062-14 on June 1, 2015, alleging that Officer Gentzler refused to take him to sick call on May 29, 2015. He also alleged that his feed-in order was not renewed as a result, which caused him to miss five lunch meals due to his inability to get to the chow hall with his crutches. *Id.*, Ex, 2, pp. 12–13.

Officers assigned to the 3-11 p.m. shift post a list of inmates scheduled for sick calls on the tier the night prior to the scheduled sick call appointment. *Id.*, Ex. 7, ¶ 5 (Gentzler Decl.).

Gentzler did not work the 3-11 shift on May 28, 2015, and was therefore not responsible for posting the list the night before the May 29, 2015, sick call appointment. *Id*. At the morning count, which occurred around 7:00 a.m. on May 29, 2015, all inmates with sick call scheduled for that day, including plaintiff, were reminded of their scheduled sick calls. *Id*., ¶ 6. Opening an inmate's cell door is not a signal for an inmate to get ready to go to sick call. *Id*., ¶ 7. Per NBCI policy inmates are advised to get ready for their appointment at count and are expected to be ready to leave when their door opens. *Id*. Over one hour after count, plaintiff's door was opened. *Id*., ¶ 8. He claimed he was not ready to leave and required more time. Gentzler does not recall any other inmates requiring additional time that morning. As plaintiff was not ready to leave, his door was closed and he was not taken to his appointment. *Id*., ¶ 9.  Gentzler avers that this was in accordance with DPSCS and NBCI policy. *Id*. Gentzler avers that he did not know why plaintiff had a sick call scheduled for that morning and officers are not made aware of the reason for medical appointments. *Id*., ¶ 10.

Plaintiff's ARP concerning the missed May 29, 2015, appointment was investigated by Lt. Sawyers. *Id.*, Ex. 2, p. 14.  Plaintiff admitted his cell door was open for three minutes so that he could be escorted to his appointment but he failed to leave. *Id*., p. 15. Sawyers noted that it is the inmate's responsibility to be ready for sick call and that inmates are given notice of their appointments the day prior to the appointment. *Id*. Additionally, Sawyers was advised by Assistant Director of Nursing Beeman that the medical department did not intend to renew plaintiff's feed-in order and Beeman advised that plaintiff should eat in the chow hall.  Plaintiff's ARP was dismissed on June 9, 2015, as lacking in merit *Id*., p. 12. He did not appeal this dismissal to the Commissioner of Corrections. *Id*., Ex. 8. (Ripps Decl.).

19

On June 3, 2015, plaintiff had a sick call appointment with R.N. Hunt regarding his desire to have his feed-in order renewed. ECF No. 12, Ex 1, p. 160. Hunt referred plaintiff's request to his provider. He noted that plaintiff was allowed to go to the chow hall with his crutches. *Id.*

Plaintiff failed to appear for physical therapy on June 4, 6, 9, 11, 15, 17, and 23, 2015. *Id.*, 384–89, 391. He was discharged from physical therapy on June 25, 2015, due to his refusal to attend treatment. *Id.*, p. 390.

On June 19, 2015, plaintiff was seen again by James Hunt, R.N., due to his request to continue feed-in status. *Id.*, pp. 161–62. Plaintiff indicated that he was losing weight due to not being provided meals in his cell and that he had missed thirty meals. *Id.* Plaintiff's weight, however, had increased from his last visit. It was noted that plaintiff ambulated well with crutches and did not require feed-in status. *Id.* Hunt again noted he would refer the request to the provider. *Id.*

On July 8, 2015, plaintiff was seen by R.N.P. Swan in regard to his request for feed-in status. *Id.*, pp. 163–64. Plaintiff continued to complain of foot pain with swelling and that he was unable to bear weight on the foot. Plaintiff reported he missed physical therapy appointments due to difficulty ambulating. *Id.* Swan discussed plaintiff's progress with the physical therapist who reported that plaintiff did not put forth any effort and was not compliant with his exercises. *Id.* It was noted that plaintiff's surgery had been three months ago and he should be ambulating. *Id.* As such, the use of crutches was discontinued and plaintiff was provided a cane to assist with ambulation. His request for feed-in status was denied. He was

referred to the Regional Medical Director for further evaluation. *Id.*  Plaintiff was advised of the decision to discontinue feed-in status and use of crutches. *Id.*, p. 165.

Plaintiff was seen by Dr. Ottey on July 30, 2015. *Id.*, pp. 168–69. He reported pain and swelling in his right ankle and that he could not bear weight on the ankle.  Dr. Ottey noted that plaintiff was "[w]ell nourished and well developed."  Dr. Ottey renewed plaintiff's feed-in status and crutches for three months. *Id.* He was scheduled to be reevaluated in one month. *Id.*

Plaintiff filed ARP-NBCI-1764-15 alleging that he was not fed his lunch meal on nine occasions beginning August 10, 2015. ECF No. 20, Ex. 2, p. 16.  Sgt. Forney investigated the claims and interviewed Officer Murray as part of his investigation. *Id.*, Ex. 4, p. 3.  Murray asserted that there was no paperwork in the unit indicating that plaintiff had feed-in status. *Id.* Additionally, plaintiff was unable to provide Murray with documents that he had feed-in status. Murray further advised that plaintiff was offered the opportunity to go to the chow hall but refused. *Id.*  Sgt. Forney also interviewed plaintiff who admitted that he did not have any documentation in his possession indicating he had a feed-in order effective after August 8, 2015. *Id.*, Ex. 9, ¶ 7.

As part of his investigation, Sgt. Forney also reviewed a document entitled "Wexford Medical Services-North Branch Correctional Institution-Medical Services-Special Needs Inmates." *Id.*, ¶ 8.  This was the only document that addressed plaintiff's feed-in status that was made available to the correctional officers working the 7:00 a.m. to 3:00 p.m. shift on the tier where plaintiff was housed. *Id.* The document was made available by Wexford between August 8, 2015 and August 17, 2015. *Id.*, ¶ 9.  According to the document, plaintiff's feed-in status expired on August 8, 2015. *Id.*, ¶ 10.  No DPSCS employee has the ability to remove an inmate

from feed-in status or to update an inmate's feed-in status. *Id*.   Plaintiff's claims were dismissed as without merit. *Id*., Ex. 2, p. 16. He failed to appeal the dismissal to the Commissioner of Corrections. *Id*., Ex. 11.

On August 18, 2015, plaintiff was seen for follow up by Dr. Ashraf. ECF No. 12, Ex. 1, pp. 176–78. Plaintiff continued to complain of right ankle pain and requested to be seen by Dr. Carls and to have his bedrest and feed-in status continued. *Id*.  Dr. Ashraf noted that he could not provide plaintiff those assignments as plaintiff was to be bearing weight on his ankle so that he could walk on his own. Dr. Ashraf renewed plaintiff's prescription for Ultram and requested a consultation with Dr. Carls. *Id*.

The following day, plaintiff had an administrative hearing which William Beeman, R.N., also attended. *Id*., p. 179.  Beeman noted that during the two and half hour hearing plaintiff displayed no signs or symptoms of right ankle pain and was observed moving both feet back and forth with full range of motion. He was also observed bending his right ankle behind the other foot without pain.  *Id*.

As a result of these observations, and a patient care conference, on August 27, 2015, R.N.P. Swan decreased plaintiff's Tramadol dosage. *Id*., p. 183. Additionally, plaintiff's crutches were discontinued and replaced with a cane and ankle sleeve. *Id*. His feed-in order was also discontinued. *Id*.

Plaintiff was seen by R.N.P. Swan on September 1, 2015, requesting that his Ultram dosage be restored to its previous level. *Id*., pp. 186–87. He stated that he required medication if he was to walk. He returned the ankle sleeve stating that it put too much pressure on the ankle. He was wearing a flip-flop on his right foot and walking by picking up a chair and moving it.

Plaintiff demonstrated limited range of motion. Minimal swelling was observed. *Id*.  Plaintiff refused to be seen by Dr. Ottey on September 3, 2015, to review his pain management plan. *Id*., p. 458. A release of responsibility form was completed. *Id*.

Plaintiff was seen by Dr. Carls on September 4, 2015. *Id*., p. 366.  Plaintiff reported difficulty with therapy and stated that he was unable to ambulate to it. Plaintiff complained the food hall and physical therapy room were too far from his cell. He stated that he could not bear weight even though his surgery had occurred five months ago.  Dr. Carls noted that plaintiff's ankle was incompletely rehabilitated. *Id*.  X-rays of the ankle were negative, but due to plaintiff's inactivity lower than normal bone density was noted. Dr. Carls again recommended physical therapy and noted that therapy, due to the logistical complaints voiced by plaintiff, would best be served by staying in medical. *Id*.  As a result of Dr. Carls' recommendations, that same day plaintiff's crutches were returned to him, and his cane relinquished to medical.  *Id*., p. 189.

On September 8, 2015, plaintiff was admitted to the infirmary so that he could more easily access physical therapy, rehabilitation services, and access to more physical therapy equipment. *Id*., p. 193. Plaintiff stated that he refused to be placed in the infirmary. *Id*. He was advised that while he could refuse treatment in the infirmary, he could not refuse placement in the infirmary. *Id*. He indicated that he would refuse all medications and treatment while housed in the infirmary. *Id*.  Plaintiff was housed in the infirmary from September 8, 2015, to September 17, 2015. *Id*., pp. 194–243.  He refused all treatment and all medications during his stay. *Id*. He was argumentative and combative with staff and expressed his desire to be in his cell so he could watch television. *Id*.

Plaintiff was seen by N.P. Clark on September 24, 2015. *Id*., pp. 245–47. He stated that he refused physical therapy because he was not able to watch football while in the infirmary. *Id*. He stated that he refused showers in the infirmary because he did not have his shower shoes but it was noted that plaintiff was housed in a private cell with a private shower in the infirmary. Plaintiff requested that his Ultram dosage be increased.  It was observed that plaintiff did not seem to understand that his refusals to participate in his care plan hindered his recovery. *Id*.  He complained that his crutches bruised his underarms, but no bruising was observed.  He was advised that he was likely using his crutches incorrectly and re-educated on their proper use, however he disagreed with Clark's assessment. *Id*.  It was further noted that Clark spoke with Dr. Carls who was disappointed in plaintiff's lack of participation in his treatment plan and that the lack of participation directly caused plaintiff's osteopenia. *Id*.  Dr. Carls noted that plaintiff would likely suffer neuropathic pain due to his inactivity and his refusal to use his foot. *Id*. Dr. Carls recommended discontinuing plaintiff's crutches in order to force him to ambulate with his foot while using a cane for stability.  Clark added Gabepantin to plaintiff's pain medication regimen. *Id.*

Clark wrote to plaintiff that same day advising him that she consulted with Dr. Carls who recommended that plaintiff no longer use crutches and as such he was being provided a cane. Plaintiff was advised that Dr. Carls recommended he bear weight on his right foot. *Id*., p. 250.

A telemedicine conference was held on October 9, 2015, with Asresahegn Getachew, M.D., *Id*., pp. 252–54.  Plaintiff was advised to continue physical therapy.  His dosage of Ultram (Tramadol) was increased, and his prescription for Gabapentin (Neurontin) discontinued. *Id*.  A consultation for physical therapy was submitted that same day. *Id*.

24

On October 22, 2015, plaintiff refused to be seen for a nursing sick call visit because he wished to shower instead.  *Id*., p. 480. That same day, he also refused to attend his physical therapy evaluation. *Id*., p. 392. He again refused to attend physical therapy on November 12, 2015. *Id*., p. 393. As this was his second refusal in a row he was discharged from physical therapy. *Id*.

On November 10, 2015, he was seen by N.P. Bilak for a provider chronic care visit. *Id*., pp. 262–64. Minimal swelling of the right ankle was observed. It was noted that plaintiff had not participated in post-operative rehabilitation and was hypersensitive to pain. *Id*. X-rays were ordered which were negative for acute fracture, dislocation, or subluxation. *Id*., p. 400.

Plaintiff returned to N.P. Bilak on November 30, 2015, to discuss the x-ray results. *Id*., pp. 267–68. Plaintiff reported that his foot was improving and he had been walking on his foot more often. He reported that he was not attending physical therapy because he was not provided a wheelchair. Bilak noted that plaintiff was ambulating with a cane and pushing a chair through the compound. He was advised to continue his current medication and increase his activity level. *Id*.

Plaintiff was seen by Nurse Moyer on December 11, 2015, due to his request for an increase in his Ultram dose. *Id*., pp. 269–70.  He walked to the medical room with the assistance of a cane and pushing a chair. While it was noted that plaintiff had refused to attend physical therapy, he was again requesting to be referred.  He was advised that his increase dose of Ultram was contingent on his attending physical therapy. *Id*.

Plaintiff refused to attend scheduled medical appointments on February 4 and 18, 2016 as well as March 12 and 13, 2016. *Id*., pp. 483, 485, 487, 488.  Release of responsibility forms were completed on each occasion. *Id*.

His medical assignment for a cane was renewed on February 25, 2016, for three months. His assignments for feed-in status and a medical cell were discontinued on that same date as no longer being medically indicated *Id*., pp. 274–75. It was noted that plaintiff was observed in the recreation yard ambulating without assistance and with a normal gait. *Id*. It was also noted that plaintiff's medical assignment for bottom bunk was current. *Id*. Plaintiff is seen regularly by prison medical staff when he chooses to attend. *Id*., Ex. 2. He may be seen more immediately by using the prison sick call system. *Id*.

### III. Non-dispositive Motions

Pending is plaintiff's "motion for reconsideration, or in the alternative motion for extension of time to comply with order to proceed in forma pauperis."  ECF No. 9.  Plaintiff indicates the at the time the court assessed the initial partial filing fee in this case his account balance was "unusually inflated" and he no longer had sufficient funds in his account to comply with the court's assessment.  *Id*.  The motion shall be denied.  Consonant with the Prison Litigation Reform Act, the fiscal administrator at plaintiff's place of incarceration may only withdraw such fees as exist from plaintiff's inmate account. *See* 28 U.S.C. §1915(b)(1).  As such, there is no need for him to seek additional time to comply with the court's order.

Pending is Medical Defendants' motion to seal.  ECF No. 13. Local Rule 105.11 governs the sealing of all documents filed in the record and states in relevant part that: "[a]ny motion seeking the sealing of pleadings, motions, exhibits or other documents to be filed in the Court

record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection." Local Rule 105.11 (D. Md. 2016). The rule balances the public's general right to inspect and copy judicial records and documents, *see Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), with competing interests that sometimes outweigh the public's right, *see In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984). The common-law presumptive right of access can only be rebutted by showing that "countervailing interests heavily outweigh the public interest in access." *Doe v. Pub. Citizen*, 749 F.3d 246, 265–66 (4th Cir. 2014) (quoting *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)). The right of access "may be restricted only if closure is 'necessitated by a compelling government interest' and the denial of access is 'narrowly tailored to serve that interest.'" *Id.* at 266 (quoting *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986)).   "[S]ensitive medical or personal identification information may be sealed," although not where "the scope of [the] request is too broad." *Rock v. McHugh*, 819 F. Supp. 2d 456, 475 (D. Md. 2011). Having shown a compelling interest in sealing plaintiff's medical records at issue, the motion to seal shall be granted

## IV. Standard of Review

### A.   Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999).   The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 561 (2007). Once a claim has been stated adequately, it may be supported by showing

any set of facts consistent with the allegations in the complaint. *Id*. at 563. The court need not,

however, accept unsupported legal allegations, *see Revene v. Charles Cty. Comm'rs,* 882 F.2d

870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,*

478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual

events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

**B.     Motion for Summary Judgment**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that
> there is no genuine dispute as to any material fact and the movant
> is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will

defeat the motion:

> By its very terms, this standard provides that the mere existence of
> *some* alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the
> requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247–48 (1986) (emphasis in original).

AThe party opposing a properly supported motion for summary judgment "'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

*Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw

all inferences in her favor without weighing the evidence or assessing the witness' credibility."

*Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644–45 (4th Cir. 2002). The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact.  No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.  *See Celotex Corp.*, 477 U.S. at 322–23.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

## V. Analysis

### A.      Failure to Exhaust Administrative Remedies

Inmates are required to exhaust "such administrative remedies as are available" before filing an action. 42 U.S.C. § 1997e(a); *see Ross v. Blake*, 136 S.Ct. 1850, 1858 (2016) ("An inmate . . . must exhaust available remedies, but need not exhaust unavailable ones."). This requirement is one of "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette,* 517 F.3d 717, 725 (4th Cir. 2008).

Exhaustion is mandatory. *Ross*, 136 S.Ct. at 1857; *Jones v. Bock,* 549 U.S. 199, 219 (2007). A court may not excuse a failure to exhaust. *Ross*, 136 S. Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion")). The purpose of exhaustion is to: 1) "allow[] a prison to address complaints about the program it administers before being subjected to suit"; 2) "reduce[] litigation to the extent complaints are satisfactorily resolved"; and 3) prepare a "useful record" in the event of litigation. *Jones,* 549 U.S. at 219. An inmate's failure to exhaust administrative remedies is an affirmative defense; defendant bears the burden of proving that he had remedies available to him of which he failed to take advantage. *Jones,* 549 U.S. at 211–12, 216; *Moore*, 517 F.3d at 725**.**

In *Ross*, the Supreme Court identified three kinds of circumstances in which an administrative remedy is unavailable. 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes,

practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

In Maryland, filing a request for administrative remedy ("ARP") with the warden of the prison is the first of three steps in the ARP process. *See* Code of Md Regs. ("COMAR"), tit. 12 §07.01.04. The ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the inmate first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR, tit. 12 §07.01.05A. If the request is denied, a prisoner has 30 calendar days to file an appeal with the Commissioner of Correction. COMAR, tit. 12 §07.01.05C. If the appeal is denied, the prisoner has 30 days to file a grievance with the Inmate Grievance Office. *See* Md. Corr. Servs., Code Ann. §§10-206, 10-210; COMAR, tit. 12 §§ 07.01.03 and 07.01.05B.

Complaints are reviewed preliminarily by the Inmate Grievance Office ("IGO"). *See* **Md. Corr. Servs., Code Ann.** §10-207; COMAR, tit. 12 §07.01.06A. If a complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. **Md. Corr. Servs., Code Ann.** §10-207(b)(1); *see* COMAR, tit. 12 §07.01.07B. The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. **Md. Corr. Servs., Code Ann..** §10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* Md. Cts. & Jud. Proc., Code Ann.. §10-208(c); COMAR tit. 12

§07.01.07-.08.  The conduct of such hearings is governed by statute.  *See* Md. Corr. Servs., Code Ann. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination.   However, a decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* Md. Corr. Servs., Code Ann. §10-209(b)-(c).

The final agency determination is subject to judicial review in Maryland state court, so long as the claimant has exhausted his/her remedies. *See* Md. Corr. Servs., Code Ann. §10-210. An inmate need not seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement. *See, e.g., Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

Plaintiff has failed to exhaust his claims that: Officer Gentzler failed to take him to sick call on May 29, 2015, resulting in his wrongfully being denied feed-in status; Officer Murray failed to feed him nine times in August 2015; Officer Troutman failed to take him to his May 2, 2014, doctor's appointment;[7] and Sgt. Forney engaged in misconduct during his August 25, 2015, interview.

## B.    Supervisory Liability

It is well established that the doctrine of respondeat superior does not apply in § 1983

---

[7]     Plaintiff has provided a copy of his ARP filed May 5, 2014, regarding this incident.  ECF No. 33, p. 7.  The Warden's response denying the ARP was not filed until July 18, 2014, outside the time established for the Warden to respond.  *Id.,* p. 8. Plaintiff filed his appeal to the Commissioner on August 11, 2014. *Id.*, p. 9. Plaintiff's appeal was dismissed as untimely filed. *Id*. Plaintiff offers no explanation for his untimely filing of the appeal.

claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit).  Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  Plaintiff has failed to point to any personal conduct by Warden Bishop, NBCI Chief of Security William Bohrer, or Wexford Health Services in regard to the matters alleged in his complaint. Plaintiff's effort to hold these defendants liable based on their supervisory roles is unavailing. They are entitled to dismissal.

## C.     Medical Claims

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

> Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences. . . . To lower this threshold would thrust federal courts into the daily practices of local police

departments.

*Grayson v. Peed*, 195 F.3d 692, 695–96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (noting that focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

1.      **Correctional Defendants**

The Fourth Circuit has identified two slightly different aspects of a correctional official's state of mind that must be shown in order to satisfy the subjective component in the context of medical care.  First, actual knowledge of the risk of harm to the inmate is required.  *Young v. Mount Ranier*, 238 F.3d 567, 575–76 (4th Cir. 2001); *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) ("It is not enough that the officer[] should have recognized it.").  Beyond such knowledge, however, the officer must also have "recognized that his actions were insufficient" to mitigate the risk of harm to the inmate arising from his medical needs. *Parrish*, 372 F.3d at 303; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Here there is no evidence that any of the named correctional defendants were aware that failure to escort plaintiff to his medical appointment on the dates indicated posed a risk of harm to him.  Moreover, on each occasion that plaintiff was not taken to his medical appointment, the record evidence shows that it was plaintiff's own conduct that prevented his attendance, rather than the deliberate interference with his medical care by correctional staff.

Specifically, there is no allegation that Officer Murray knew or should have known that plaintiff would be without pain medication if he missed his November 22, 2015, appointment. Additionally, the record evidence demonstrates that plaintiff was seen by Dr. Ottey on November 12, 2015, and additional pain medication was prescribed. Moreover, plaintiff was seen by Nurse Fuente on December 3, 2015, and his prescription for Tramadol was still active.  As such, it does not appear that the failure to attend the November 22, 2015, appointment actually resulted in the discontinuation of his pain medication.

Similarly, there is nothing before the court which would demonstrate that Officer

35

Gentzler knew or should have known that plaintiff's inability to attend the May 29, 2015, sick call appointment would result in his feed-in order not being renewed.  Plaintiff was seen by medical staff close in time to the May 29, 2015, incident and could have rectified his feed-in status at any of those appointments.  In fact, the medical records reflect a disagreement among medical staff as to whether the feed-in order should be renewed; with R.N.P. Swan specifically declining to renew the feed-in order in June 2015.

Plaintiff's complaints regarding delay in his medical care are also unavailing as he has failed to produce evidence of a detrimental effect as a result of any of the alleged delays. Plaintiff alleges that his consult with the orthopedist was delayed for a month but he does not explain how this delay worsened his injury or otherwise caused him harm.  Moreover, there is simply no evidence that Troutman was responsible for the missed appointment.  Rather, the evidence, including plaintiff's own admission, is that he was either unable or unwilling to prepare himself to go to the appointment in a timely manner.  Troutman was responsible for escorting other inmates who were prepared to attend their appointments and need not have waited beyond the 30 minutes he waited for plaintiff.

Plaintiff's claims that Officer Gotjen refused to take him to physical therapy unless he used a walker is also unavailing. While it is true that plaintiff had been assigned crutches for his use, he was assigned to disciplinary segregation and due to the specific security concerns regarding escorting disciplinary segregation inmates to medical appointments, Gotjen conferred with medical staff who authorized plaintiff's use of a walker for escort.  Plaintiff, apparently unhappy with this result, simply refused to attend his therapy sessions.  Plaintiff indicates that he filed an ARP concerning Gotjen's failure to provide him a wheelchair or crutches which was

36

found meritorious and security staff were educated and reminded to follow medical orders as written by the physician.  ECF No. 33, pp. 16, 18.  The success of plaintiff's ARP does little to advance his Eighth Amendment claim against Gotjen. Gotjen sought and received permission from medical to escort plaintiff using a walker. Gotjen cannot be said to have been deliberately indifferent to plaintiff's medical needs when he secured approval for the substitution in assistive devices.  Moreover, plaintiff has failed to allege how he was injured as a result of the delay in his physical therapy. Therapy was resumed one month later when plaintiff was removed from disciplinary segregation. Thereafter plaintiff failed to participate actively in therapy, to his detriment and to his medical providers' consternation.

## 2.      Medical Defendants

The undisputed record establishes that plaintiff did not suffer a serious medical need for which he did not receive constitutionally adequate medical care.  Indeed, the records filed establish that medical defendants have treated plaintiff's complaints and filed the appropriate requests for consultation with outside specialists, provided him surgery, post-operative therapy, pain medication, and special medical assignments. Medical defendants are therefore entitled to summary judgment.

In essence, for plaintiff to prevail, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness.  *Miltier v. Beorn*, 896 F.2d 848, 851 (*overruled in part on other grounds by Farmer*, 511 U.S. at 837; *aff'd in pertinent part by Sharpe v. S.C. Dep't of Corr.*, 621 Fed.Appx. 732 (Mem), (4th Cir. 2015). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard."  *Id*. Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to

inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms.  *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998).  Mere negligence or malpractice does not rise to a constitutional level. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle*, 429 U.S. at 106).

The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*"  *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir.1977) (emphasis added).  The record evidence indicates that plaintiff's request for treatment were considered and his needs addressed. The delays that have occurred do not appear to be deliberate, nor have they resulted in harm to plaintiff.  To the extent some of plaintiff's complaints have gone unaddressed, "an inadvertent failure to provide adequate medical care does not amount to deliberate indifference."  *Estelle*, 429 U.S. at 105–06.  Plaintiff's numerous grievances are reflective of his frustration, but "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged."  *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir.1970)).  There are no exceptional circumstances alleged in this case. Moreover, it must be noted that it appears from the records provided that it was plaintiff's obstinacy, rather than the conduct of any of the named defendants, that inhibited his full and complete recovery from surgery.

Plaintiff's complaint that defendants discontinued his feed-in status and use of a cane during the care conference, which was within the week countermanded by the orthopedist Dr. Carls, (ECF No. 32, ¶¶ 30 & 31) does not create a dispute of a genuine issue of material fact. Plaintiff was non-compliant with his care plan. In an effort to move him into compliance his day to day providers endeavored to remove him from feed-in status and to force him to walk with a cane. Dr. Carls disagreed with that assessment and reinstituted plaintiff's feed-in status and returned plaintiff's crutches.  These disputes regarding the proper care plan do not demonstrate deliberate indifference to plaintiff's serious medical needs. Rather, they evidence a dispute in regard to how best assist plaintiff in complying with treatment plans, plans to which he was demonstrably hostile and uncooperative.  That Dr. Carls chose to provide plaintiff an additional opportunity to engage in physical therapy does not demonstrate that the named medical defendants erred in failing to do so.

Additionally, plaintiff's complaint that he was sent to the WCI infirmary without any property and that he protested his conditions, e.g. lack of property and lack of access to viewing football by declining all treatment, (ECF No. 32, ¶¶ 33 & 34) does nothing to advance his claim. In fact, it demonstrates his obduracy to the treatment being offered.

**D.     Conditions of Confinement**

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.  *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society."  *Id*.  As in consideration of medical

claims, evaluations of conditions of confinement claims require the demonstration of an objective and subjective component.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that "the deprivation of [a] basic human need was *objectively* sufficiently serious," and that "*subjectively* the officials acted with a sufficiently culpable state of mind."

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir.1993)). "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir.1993).

Medical records indicate that plaintiff's feed-in status was to be renewed for two months on May 15, 2015. However, it is clear that that information was neither sent to the Food Service Department nor was it communicated to custody staff on the tier.  Moreover, is appears that the order was not entered as plaintiff was seen by R.N. Hunt on June 3, 2015, and June 19, 2015, seeking to have his feed-in status renewed. On both occasions, Hunt referred plaintiff to a medical provider, noted that plaintiff could use his crutches to walk to the chow hall, and was not losing weight as he alleged.  ECF No. 12, Ex. 1, p. 34, 161–62.  R.N.P. Swan also declined to renew the feed-in status on July 8, 2015, noting plaintiff's noncompliance with physical therapy and the directive to begin bearing weight on his foot.  *Id*., p. 163–64. Plaintiff's feed-in order was not renewed until June 30, 2015, after his consultation with Dr. Ottey. *Id*., pp. 168–69.

Additionally, during the investigation of plaintiff's ARP, custodial staff were advised that medical personnel did not intend to renew plaintiff's feed-in order and he should instead go to

the chow hall with his crutches. That information, coupled with the lack of a feed-in order from May until the end of July, 2015, makes it clear that correctional defendants cannot be said to have been deliberately indifferent to a known risk to plaintiff's health or safety.  Correctional staff was entitled to rely on the professional judgment of health care providers. *Miltier*, 896 F. 2d at 854–55.

While plaintiff's medical record reflects in May an intention to continue plaintiff's feed-in status, that did not happen. Two other medical providers determined in May and June that it was not in plaintiff's best interest to reinstate the feed-in status given his failure to comply with his physical therapy regimen.   There is simply no evidence that any of the named medical defendants intentionally interfered with plaintiff's feed-in status or deliberately disregarded a known risk to his health or safety.

Despite his reluctance to do so, plaintiff was permitted to go to the chow hall for meals. During this time, he received at least one meal a day, and had access to the prison's commissary to supplement his meals.[8]   Moreover, plaintiff has failed to establish that his conditions of confinement resulted in any injury.  While it is clear that plaintiff missed meals, there is no record that he suffered any injury therefrom. To the contrary, medical records demonstrate that he gained weight and appeared well nourished during the time at issue.  ECF No. 12, Ex. 1, pp. 152–55, 161–62, 163–64, 266–67, 274–75.

Plaintiff's claim that he again was denied nine meals in August 2015 is likewise unavailing.  Plaintiff's claim regarding the August disruption in meals lacks the seriousness required of a conditions of confinement claim. And he has again failed to demonstrate any injury

---

[8]      Plaintiff indicates that what he could purchase from commissary was restricted due to his being on a "medical diet."  ECF No. 32, ¶ 38.

arising from the denial of nine meals.  *White v. Gregory,* 1 F. 3d 267, 269 (4th Cir. 1993) (holding that feeding prisoner two times per day does not state a constitutional claim).  Moreover, there is no evidence that Murray was aware that plaintiff had feed-in status from August 8 to August 17, 2015.  To the contrary, the information provided to the 7:00 a.m to 3:00 p.m. tier officers indicated that plaintiff's feed-in order expired on August 8, 2015.  Any error by medical defendants' in reporting that plaintiff was entitled to feed-in status during that time appears to have been nothing more than an oversight, which is insufficient to sustain plaintiff's Eighth Amendment claim.[9]

### E.    Conspiracy

Plaintiff's bald claim that he became suspicious that medical and correctional defendants "colluded" to deprive him of medical care and meals is insufficient. A conclusory allegation of a conspiracy such as is made in this case is insufficient to state a claim.  *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2nd Cir. 1997) (unsupported claim of conspiracy to issue false disciplinary reports fails to state claim); *Manis v. Sterling*, 862 F.2d 679, 681 (8th Cir. 1988) ("Allegations of conspiracy . . . must be pled with sufficient specificity and factual support to suggest a meeting of the minds.") (internal quotation marks omitted);  *Langworthy v. Dean*, 37 F. Supp.2d 417, 424–25 (D. Md.).  Plaintiff's conspiracy claim is thus subject to dismissal.

### VI. Conclusion

For the aforementioned reasons, defendants' motion to dismiss, or in the alternative motion for summary judgment, construed as a motion for summary judgment, shall be granted.

---

[9]      Having found no constitutional violation, the court need not address defendants' qualified immunity defense.

A separate order follows.


__March 8, 2017_                                          _____/S/_____
Date                                                             Catherine C. Blake
                                                                    United States District Judge